FILED

05/23/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

## STATE OF TENNESSEE v. PETERPAL T. TUTLAM

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-2894    Cheryl A. Blackburn, Judge**

_____

### No. M2016-01659-CCA-R3-CD

_____

A Davidson County Criminal Court Jury convicted the Appellant, Peterpal T. Tutlam, of two counts of especially aggravated robbery, two counts of especially aggravated kidnapping, and two counts of aggravated rape, Class A felonies. After a sentencing hearing, the trial court sentenced the Appellant to twenty-five years for each conviction and ordered that the sentences be served consecutively for a total effective sentence of one hundred fifty years. On appeal, the Appellant contends that his effective sentence is excessive. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Elizabeth Ann Russell (on appeal) and David Harris (at trial), Franklin, Tennessee, for the appellant, Peterpal T. Tutlam.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Factual Background

This case relates to Yangreek Wal, Duol Wal, Tut Tut, and the Appellant kidnapping and terrorizing the two male victims, P.T. and R.W., on March 17, 2012.[1] In November 2013, the Davidson County Grand Jury indicted the Appellant for two counts

_____

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

of especially aggravated kidnapping with a deadly weapon, two counts of especially aggravated robbery, and four counts of aggravated rape accomplished by force and while armed with a weapon. The State dismissed two of the aggravated rape charges before trial. Although the Appellant does not contest the sufficiency of the evidence, we will summarize the evidence presented at trial.

In the early morning hours of March 17, 2012, the victims, who had been friends since high school, were walking through a breezeway in R.W.'s apartment complex. The victims passed two men, and the men asked the victims a question. One of the men then attacked R.W. by hitting him on the head and putting a knife to his throat. The man pinned R.W. to an apartment door and demanded that R.W. give him everything in R.W.'s pockets. Meanwhile, the second man approached P.T. and began beating him. A third man entered the breezeway and joined the other two in attacking the victims. The three men took the victims' wallets and cellular telephones out of their pockets and dragged them to a small car where a fourth man was waiting.

The four men forced the victims into the back seat of the car. P.T. was sitting in the middle of the back seat, R.W. was sitting to P.T.'s left, and one of the men was sitting to P.T.'s right. The other three men were sitting in the front of the car with one of them sitting in the driver's seat, one sitting on the center console, and one sitting in the passenger seat. The four men drove the victims to an ATM. During the drive, the men hit the victims and threatened to kill them. They also passed around the knife and stabbed the victims' arms and legs. When they arrived at the ATM, the four men demanded the personal identification numbers for the victims' bank cards, and the victims tried to cooperate by giving them the numbers. The driver and another man in the front went to the ATM and withdrew money from the victims' bank accounts. While they were gone, the third man in the front got out, opened the rear driver-side door, and tried to break R.W.'s hand by bending it backward.

When the two men returned from the ATM, the driver drove everyone to a second ATM. There, the same two men went to the ATM and withdrew money from the victims' bank accounts while the two remaining men and the victims waited in the car. The victims were then ordered to fellate each other. P.T. testified:

> At least two people were in the car at this point. That part is a little fuzzy. I'm not sure if we had gotten back in the car and began moving yet. But at one point everybody was in the car while we were -- while this was happening because it was moving. They made us take turns and -- they made us take turns, and the car was moving at one point during that.

After being in the car for a total of about forty-five minutes, the driver stopped the car. The four men ordered the victims to take off their clothes and ordered them out of the car. The four men also got out and kicked R.W., who was lying face-down on the road, on the head. The four men got back into the car and drove away. The victims walked to a house, and P.T. asked a woman who was sitting on her back patio to call 911. A man in the house brought out towels to the victims.

When police officers arrived at the scene, they found the naked victims wrapped in blankets. The victims were "drenched in blood" from cuts and lacerations, and R.W. appeared to have a head injury. The victims told police officers what had happened and were transported to Vanderbilt Hospital. P.T. was released from the hospital later that day, and R.W. stayed in the hospital two days. Both of the victims had at least ten stab wounds on their arms and legs. P.T. testified that he also had a large scrape on his head, a scratch across his face from a knife blade, an almost-broken finger, bruising, and swelling. He said that the stab wounds in his legs caused painful walking for weeks and that it took six months for his hand to heal. R.W. testified that his being kicked on the head while lying on the road resulted in a cut above his eyebrow that required more than thirty stitches. He also had a headache for weeks and had to use a cane to walk for three weeks due to punctures in his thighs. P.T. described the attack as emotionally devastating, and R.W. said that he experienced post-traumatic stress disorder and anxiety after the attack.

The victims described their attackers to police as tall, thin, dark-skinned, and speaking with an accent that sounded African. The attackers spoke English but also spoke a foreign language the victims did not recognize.[2] The victims said all four participated in the violence. The attackers did not have slurred speech, and the victims did not smell alcohol on their breaths. In August 2012, the police showed the victims photograph arrays containing the Appellant's photo, and both of them selected the Appellant but could not say definitively he was involved. Moreover, at trial, both of the victims testified that the Appellant was not one of the two men who first attacked them in the breezeway, and neither victim could say specifically what the Appellant did during the incident.

Detective Brandon Dozier investigated the case and developed Yangreek Wal, Duol Wal, Tut Tut, and Chudier Timothy as suspects. Video from a Regions Bank ATM showed Yangreek Wal and Tut Tut using R.W.'s bank card on March 17, and a search warrant was executed at the home of Yangreek and Duol Wal on March 19. In Duol Wal's bedroom, the police found bloody clothing, two Regions bank card receipts, R.W.'s driver's license, money, a money clip that had been taken from one of the victims,

---

[2] The language turned out to be Nuer.

and a folding knife with P.T.'s and R.W.'s blood on the blade. A four-door black Saturn was towed from the residence, and a large amount of blood was in the back seat of the car.

The police arrested Duol Wal and Tut Tut on March 19, 2012, and U.S. Marshals arrested Yangreek Wal in Lincoln, Nebraska, in July 2012. Detective Dozier went to Nebraska, spoke with Yangreek Wal, and learned that "Chudier Timothy" was the Appellant's childhood nickname. Fingerprints lifted from the exterior of the Saturn matched the Appellant. On August 4, 2012, Detective Dozier showed photograph arrays containing the Appellant's photograph to the victims, and both of them selected the Appellant's photograph. In the comments section of the identification form, P.T. wrote, "Eliminating all others. I am going to choose #5 because of his face & skin & shape of his head[.] The way his ears sit on his head & stick out." R.W. wrote on his identification form that "five is the only one that looks familiar, it is because of skin tone and face." A warrant was issued for the Appellant's arrest, and he was arrested in Minnesota in September 2013. On cross-examination at trial, defense counsel asked Detective Dozier if the victims made "absolute or certain identifications" of the Appellant, and Detective Dozier said he would describe their identifications as "accurate."

Yangreek Wal, who pled guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery prior to the Appellant's trial in exchange for the State's dismissing the rape charges and agreeing to concurrent sentencing for the convictions, testified that he; his brother, Duol Wal; and his cousins, Tut Tut and the Appellant, were at a reggae nightclub in the early morning hours of March 17, 2012. They decided to rob someone and went to an apartment complex. Yangreek Wal, who was driving, waited in the car while his brother and cousins got out; they returned to the car with the victims. The Appellant sat on the center console beside Yangreek Wal, Tut Tut sat in the passenger seat beside the Appellant, and Duol Wal sat in the backseat with the victims. Yangreek Wal testified about driving to the ATMs and using the victims' bank cards to withdraw money. He also testified about the four men beating and stabbing the victims; forcing them to engage in oral sex; and leaving them, albeit clothed, on "a little street." Two days after the incident, Yangreek Wal and the Appellant boarded a Greyhound bus and fled to Lincoln, Nebraska. They stayed together in Nebraska for a month, split up, and went to different parts of Minnesota.

On cross-examination, Yangreek Wal acknowledged that the Appellant had been drinking alcohol prior to going to the nightclub and that he continued to consume alcohol at the club. The Appellant was very intoxicated and was stumbling and dragging his feet. Yangreek Wal acknowledged that he had not yet been sentenced and that he was hoping

for leniency in sentencing. On redirect examination, Yangreek Wal acknowledged that the Appellant helped shove the victims into the car.

Duol Wal testified for the Appellant that the Appellant was with him, Yangreek Wal, and Tut Tut when they left the nightclub on March 17, 2012, but that the Appellant was very intoxicated and did not know they were planning to commit a robbery. Duol Wal and Tut Tut got out of the car at the apartment complex and confronted the victims in the breezeway. The Appellant remained in the car with Yangreek Wal. Duol Wal and Tut Tut returned to the car with the victims and forced the victims into the back seat. Duol Wal said that only he and Tut Tut hit and stabbed the victims in the car and that the Appellant was so intoxicated that the Appellant was "knocked out really." Duol Wal and Tut Tut forced the victims to fellate each other "to humiliate them," forced them to "strip down to their boxers," and "kicked them out of the vehicle." The Appellant never said anything to the victims, did not participate in the crimes, and did not receive any money from the robberies.

On cross-examination, Duol Wal acknowledged that he pled guilty to two counts of especially aggravated kidnapping and two counts of especially aggravated robbery in exchange for the State's dismissing the remaining charges and that he already had been sentenced. He also acknowledged that at his guilty plea hearing, the State read the facts of the crimes into evidence and that he told the trial court the facts were correct. The trial court specifically asked Duol Wal at the hearing if the Appellant was the fourth person involved in the crimes, and he said yes. He said he lied to the trial court. He acknowledged that he never told the trial court that the Appellant was intoxicated or that the Appellant did not have anything to do with the crimes.

At the conclusion of the proof, the jury convicted the Appellant as charged of two counts of especially aggravated kidnapping with a deadly weapon, two counts of especially aggravated robbery, and two counts of aggravated rape accomplished by force and while armed with a weapon. At the sentencing hearing, Officer Christopher Houk of the Metropolitan Nashville Police Department (MNPD) testified that on February 24, 2012, he was in a parking lot at Thompson and Murfreesboro Roads and heard multiple gunshots. He and another officer went to the area where the shots were coming from and saw the Appellant run across the street. The officers began chasing the Appellant and ordered him to stop, but he continued to run. The officers eventually apprehended the Appellant and arrested him. The victim advised the officers that the Appellant and another male had been breaking into his vehicle, that an altercation occurred, and that the Appellant or the accomplice fired shots into a crowd. The police considered charging the Appellant with multiple counts of aggravated assault or attempted murder. However, a gun was found on the Appellant's accomplice, not the Appellant. The Appellant ultimately pled guilty to resisting arrest.

On cross-examination, Officer Houk acknowledged that Duol Wal may have been the Appellant's accomplice on February 24, 2012. He also acknowledged that he smelled alcohol on the Appellant's breath and said that "I think he admitted that he drank two or three forty ounce beers."

Officer Paul Ellis of the MNPD testified that he responded to the scene and spoke with the victim on February 24, 2012. The victim told Officer Ellis that the Appellant pulled out a gun and that the Appellant's accomplice tried to stop the Appellant from firing the weapon. The Appellant and his accomplice ran, the Appellant threw down the gun, and the accomplice picked it up. The victim was a truck driver from California and did not want to prosecute the case.

David Paduil testified for the Appellant that he was the pastor of a church the Appellant's family attended in Gallatin, Tennessee. He said that he knew the Appellant "from back home" in South Sudan and that the Appellant came to Tennessee when the Appellant was twelve or thirteen years old. The Appellant became a youth member at Mr. Paduil's church and was "very shy, generous, and considerate in the community." Mr. Paduil said that the Appellant was a follower, not a leader; that the Appellant was not violent; and that he never saw the Appellant act strangely or misbehave. At some point, the Appellant began drinking alcohol and stopped going to church. Mr. Paduil said that the Appellant grew up in South Sudan where people, including women and children, were killed, and where there was a lot of hunger. He said he thought the Appellant's childhood in South Sudan pushed the Appellant into alcoholism and changed his behavior. Mr. Paduil described the Appellant's crimes in this case as "terrible" but asked that the trial court "give him a minimum sentence so that he can go and live his life."

Nyon Diw-Ouederaogo, the Appellant's cousin, testified that he grew up with the Appellant in South Sudan and came to the United States when he was fourteen years old. He said that while he lived in South Sudan, "I witness shooting, people being shot in front of us while we run for our life. I witness people that starve to death. And it stay with me to this day." The Appellant saw the same things as Mr. Diw-Ouederaogo and was still struggling with what he witnessed. Mr. Diw-Ouederaogo said that the Appellant was more of a follower than a leader and that the Appellant was the most caring and loving person he knew. About three years before the crimes, the Appellant began drinking alcohol. One night in 2008, Mr. Diw-Ouederaogo picked up the Appellant from a party; the Appellant was so intoxicated that he could not walk. The Appellant would drink alcohol to the point where he "pretty much blacked out." Mr. Diw-Ouederaogo said that he was sorry for what the victims went through and that the Appellant should be punished. However, he asked that the Appellant receive the minimum sentence so that the Appellant "can have a life left after that because he's worth saving." On cross-

examination, Mr. Diw-Ouederaogo acknowledged that drinking alcohol could change a person's personality but said that the Appellant did not become aggressive when the Appellant consumed alcohol.

Nyater Tutlam, the Appellant's older sister, testified that South Sudan was devastated by war and that her family moved from country to country to survive. Ms. Tutlam's family ended up in Kenya, her father died, and her mother had to move the children "from place to place just to get some food or to be safe." Ms. Tutlam said that the children witnessed "a lot of things," including seeing bodies floating in the river when they went to fetch water, and that the Appellant witnessed murder and starvation. After the Appellant moved to the United States, he began having a serious problem with alcoholism, and his family reminded him that the family came to the United States for a better life. Ms. Tutlam said that the Appellant was "the best person you want to be around" when he did not drink alcohol but that he became lazy and would not do anything for himself when he consumed alcohol. Ms. Tutlam had never known the Appellant to be violent, and he was not aggressive when he was intoxicated. On cross-examination, Ms. Tutlam acknowledged that she had never committed any crimes.

The Appellant testified that he had "a pretty tough life" in South Sudan and that he saw "people getting killed, people starving to death." Rebels raided villages, killed the men, raped the women, and cut up bodies. The Appellant's family did not have a stable place to live and sometimes did not have food. The Appellant came to the United States in 1999, and his family began attending church. The Appellant's mother obtained employment, and the Appellant always worked. He said he began abusing alcohol in 2008 because he was "dealing with a lot of personal issues." He also began interacting with a "different kind of people."

The Appellant testified that sometimes he drank alcohol until he passed out. He said that he was "truly sorry" for what the victims endured and that there was "no excuse for the behavior of those who assaulted" the victims. However, the Appellant was "intoxicated and incoherent" when the crimes occurred and did not know what happened until Yangreek Wal told him the next day. He said that he did not stop the crimes because he was unaware of what was happening and that "[i]f I were in my right mind, I would have done everything I could to stop it." He said that he left Tennessee because he was "upset about the whole thing," "wanted to get away from it all," and wanted to get away from his codefendants. He asked for "mercy" from the trial court.

On cross-examination, the Appellant acknowledged that on March 17, 2012, he was twenty-seven years old, Duol Wal was twenty-one, Yangreek Wal was eighteen, and

Tut Tut was fifteen.[3]  He also acknowledged that in recorded jailhouse telephone calls that were played for the jury at trial, he asked Yangreek Wal not to talk to the police and never mentioned that he was intoxicated at the time of the crimes.  The Appellant said that he remembered going to the nightclub before the crimes but that his memory about the rest of the night was "very fuzzy."  The State asked if it was possible he did not remember committing the crimes, and he said no.  He denied buying Yangreek Wal's bus ticket to Nebraska and acknowledged that he could have contacted the police about the crimes but failed to do so.  He denied breaking into a vehicle, shooting a gun, or running from the police on February 24, 2012.

The State introduced the Appellant's presentence report into evidence.  According to the report, the Appellant was born on July 2, 1984, was expelled from Hunter's Lane High School in Nashville in the eleventh grade, and did not obtain his GED.  In the report, the Appellant described his mental and physical health as "good" and stated that he did not have any physical or mental disabilities.  The Appellant said that he began using marijuana every other day when he was fifteen and that he began drinking alcohol when he was eighteen.  The Appellant stated in the report that he worked as a forklift operator for Aerotek Staffing Agency from 2003 to 2013, that he worked as a general laborer for Dell Computer Company for eight months in 2004, and that he worked as a janitor for Tyson's Fresh Meat from 2004 to 2005 or 2006.  The report showed that the Appellant had the following prior convictions:  driving under the influence (DUI) in 2013; resisting arrest in 2012; making a false report and driving on a revoked license in 2011; driving on a revoked license in 2008; driving on a revoked license and driving on a suspended license in 2007; failing to stop at the scene of an accident, DUI, and driving on a suspended license in 2006; and driving on a suspended license, DUI, and underage consumption of alcohol in 2005.

The trial court noted that the range of punishment for the convictions, Class A felonies, was fifteen to twenty-five years.  See Tenn. Code Ann. § 40-35-112(a)(1).  The trial court found that the following enhancement factors were applicable to all of the Appellant's sentences: (1), that the Appellant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, due to his prior misdemeanor convictions, his drug use, and his firing a weapon on February 24, 2012; (2), that the Appellant was a leader in the commission of an offense involving two or more criminal actors, because the Appellant was one of the three men who first attacked the victims in the breezeway, participated in stabbing the

---

[3] Tut Tut was charged in a delinquency petition with two counts of especially aggravated kidnapping, two counts of especially aggravated robbery, and four counts of aggravated rape.  His case was transferred to the Davidson County Criminal Court, and he pled guilty to the offenses in exchange for an effective thirty-year sentence.  Tut Mayal Tut v. State, No. M2016-01673-CCA-R3-PC, 2017 WL 3475532, at *1 (Tenn. Crim. App. at Nashville, Aug. 14, 2017), perm. app. denied, (Tenn. Dec. 6, 2017).

- 8 -

victims in the car, and tried to get his codefendants not to cooperate with the police; (5), that the Appellant treated, or allowed the victims to be treated, with exceptional cruelty during the offenses, due to the "mean spirited, despicable, heinous, and revolting" way the victims were treated; and factor (8), because the presentence report showed that the Appellant was on probation in 2005 when he committed another offense[4]. See Tenn. Code Ann. § 40-35-114(1), (2), (5), (8). The trial court also applied enhancement factor (6), that the personal injuries inflicted upon the victims was particularly great, to the Appellant's sentences for especially aggravated kidnapping and aggravated rape. See Tenn. Code Ann. § 40-35-114(6).

In mitigation, the trial court found applicable to the Appellant's especially aggravated kidnapping conviction that the Appellant voluntarily released the victims. See Tenn. Code Ann. § 39-13-305(b)(2). However, the court gave the factor no weight. Regarding consecutive sentencing, the trial court found the Appellant to be a dangerous offender and ordered that he serve all of his sentences consecutively for a total effective sentence of one hundred fifty years. See Tenn. Code Ann. § 40-35-115(b)(4). On appeal, the Appellant challenges the length of his effective sentence.

## II. Analysis

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

---

[4] According to the presentence report, on February 6, 2005, the Appellant was convicted of driving on a suspended license and underage consumption of alcohol and received probation sentences of six months and eleven months, twenty-nine days, respectively. He then committed additional misdemeanor crimes in 2005.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in § 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Initially, we note that the crux of the Appellant's argument is that the trial court erred by ordering consecutive sentencing. However, the Appellant also takes issue with the trial court's application of enhancement factors. The Appellant does not contend the court misapplied the factors but claims the court failed to specify the facts of the case that justified application of the factors. We disagree. In addressing the enhancement factors, the trial court explained why each factor was applicable. Therefore, we find no merit to this claim.

Regarding consecutive sentencing, the Appellant contends that the trial court erred because "no reference was made specifically to the Appellant's involvement giving rise to the applicability of [the dangerous offender] factor" and because "there is not sufficient proof in the trial court's findings which give rise to imposition of consecutive sentencing." Again, we disagree with the Appellant.

Consecutive sentencing is appropriate when a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). "Where . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority" and can either conduct a de novo review to determine if an adequate basis exists for consecutive sentences or remand the case to the trial court for consideration of the requisite Wilkerson factors. Pollard, 432 S.W.3d at 864-65.

In ordering consecutive sentencing, the trial court stated as follows:

And I find [factor four, that the Appellant is a dangerous offender,] based on the facts that we've heard, the testimony of the two victims. But in order to also have consecutive sentences I have to go further with regard to the dangerous factor, dangerous offense, is that to find someone a dangerous offender I have to determine that the aggregate term reasonably relates to the severity of the offenses and it's necessary to protect the public from further serious criminal conduct by the defendant. And by doing that I have to refer to the facts of the case. I think I need to put in the record when you look at the testimony most particularly of [P.T.] he talks about a man approaching him, attacking me, he pushed me to the ground. Now, this is just in the breezeway. He hit me, forced me to the ground. My pockets were being rummaged, he took my cell phone, my wallet, my keys, my work supplies, and a pink marker, which ended up in the breezeway. They were threatening to kill us if we looked. They were being extremely violent. Don't look at me, or I'll kill you. [R.W.] was stabbed first in the leg, and I was stabbed in the leg. It was either by the front -- the middle or the front passenger person. They were passing the knife around. They were still being hit. Wanted to know -- let's see, they asked me who had kids. One from the front, we're going to kill you, we're going to take you to Waverly, and then we're going to kill you. They were ridiculing us especially about the sex, like it was our idea. They stopped, they were going to kill us and leave us out there. They forced [R.W.] to lay on the ground, and I was forced out the side. They were telling us to get

undressed.  We were beaten.  There were three individuals that were doing that.  Shoved me to the ground, they told us to lay on the ground, and the people were stomping [R.W.] on the head, yelling not to look at the license plate.  And they left them there.  They were helpless.  We were naked, being beaten, helpless, all of our clothes, our shoes, our socks[,] our jeans, everything was taken.  We were left naked and bleeding all over.  I believe the total stab wounds were over twelve -- or ten or twelve by all of them.  Their faces were beaten so that they couldn't be recognized.  They had psychological difficulties, walked on canes for months and that sort of thing.  During this time I think the testimony was I was crying, I begged them to stop, it was emotionally devastating, I was in therapy for a year.  Mr. Tutlam was in the front passenger middle.  He took turns -- they took turns hitting and stabbing and threatening us.  It was moving hell.  I had nightmares for three to four months.  That was just [P.T.]  They were cooperative.  We gave them our things.  They took me by the collar -- this is [R.W.] -- knife in the face, punched a lot.  The physical punching and the knife intimidation, they put what he thought was a gun to his head.  [P.T.] was stabbed in the thigh, I had a total of ten stab wounds.  There was also then the attempt to break [R.W.'s] hand.  If you recall the testimony -- and he says it was more about the power and the torture, kicking me, standing outside the car, kicked in the face, attempted to break my hand, punched, continually asked if I wanted to die, was going to go to Waverly and dump me in the woods, mentioned about the children, we were begging them not to kill us.  We heard laughter during the sex.  He had thirty plus stitches on his face.  He could not walk without a cane for at least two and a half to three weeks.  He had a brain injury.  He suffered from PTSD, anxiety, and his mind and his soul were drastically different.  Those are the facts that are the facts of a dangerous offender.  Coming on the heels of also where he used a gun to shoot at somebody I find that the aggregate term of -- all of these offenses are going to run consecutive with each other because it is reasonably related to the seriousness of this event.  Not only that, he fled from this jurisdiction.  He tried to get the others to cover it up, to not do that.  That shows he has absolutely no hesitation and that we have to protect the public from further serious conduct by the defendant.  So that's my decision.  All sentences run -- twenty-five years on each one of them, all of them running consecutive to each other.

We fail to see what more the trial court could have said to justify the imposition of consecutive sentencing based upon the Appellant's being a dangerous offender.  The Appellant is not entitled to relief.

## III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE